(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GARLAND, ATTORNEY GENERAL, ET AL. *v.* ALEMAN GONZALEZ ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–322. Argued January 11, 2022—Decided June 13, 2022*

Respondents are aliens who were detained by the Federal Government pursuant to 8 U. S. C. §1231(a)(6) of the Immigration and Nationality Act (INA). Respondents Esteban Aleman Gonzalez and Jose Eduardo Gutierrez Sanchez—the named plaintiffs in the case that bears Aleman Gonzalez's name—are natives and citizens of Mexico who were detained under §1231(a)(6) after reentering the United States illegally. They filed a putative class action in the United States District Court for the Northern District of California, alleging that aliens detained under §1231(a)(6) are entitled to bond hearings after six months' detention. The District Court certified a class of similarly situated plaintiffs and "enjoined [the Government] from detaining [respondents] and the class members pursuant to section 1231(a)(6) for more than 180 days without providing each a bond hearing." *Gonzalez* v. *Sessions*, 325 F. R. D. 616, 629. A divided panel of the Ninth Circuit affirmed. *Aleman Gonzalez* v. *Barr*, 955 F. 3d 762, 766. Respondent Edwin Flores Tejada—the named plaintiff in the case that bears his name—is a native and citizen of El Salvador. He likewise reentered the country illegally and was detained under §1231(a)(6). He filed suit in the Western District of Washington, alleging that §1231(a)(6) entitled him to a bond hearing. The District Court certified a class, granted partial summary judgment against the Government, and entered class-wide injunctive relief. A divided panel of the Ninth Circuit affirmed. *Flores Tejada* v. *Godfrey*, 954 F. 3d 1245, 1247. This Court granted certiorari and instructed the parties to brief the threshold

——————
*Together with *Garland, Attorney General, et al.* v. *Flores Tejada et al.* (see this Court's Rule 12.4), also on certiorari to the same court.

question whether the District Courts had jurisdiction to entertain respondents' requests for class-wide injunctive relief under the INA.

*Held*: Section 1252(f )(1) of the INA deprived the District Courts of jurisdiction to entertain respondents' requests for class-wide injunctive relief.  Pp. 3–10.

(a) Section 1252(f )(1) generally strips lower courts of "jurisdiction or authority" to "enjoin or restrain the operation of " certain provisions of the INA.  The ordinary meaning of the terms "enjoin" and "restrain" bars the class-wide relief awarded by the two District Courts here. When a court "enjoins" conduct, it issues an "injunction," which is a judicial order that "tells someone what to do or not to do."  *Nken* v. *Holder*, 556 U. S. 418, 428.  The Court has suggested that "restrain" sometimes has a "broad meaning" that refers to judicial orders that "inhibit" particular actions, and at other times it has a "narrower meaning" that includes "orders that stop (or perhaps compel)" such acts.  *Direct Marketing Assn.* v. *Brohl*, 575 U. S. 1, 12–13.    In §1252(f )(1), the object of the verbs "enjoin or restrain" is the "operation of " certain provisions of the INA—provisions that charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens.  See §§ 1221–1232.  Putting these terms together, §1252(f )(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the referenced INA statutory provisions.

Section 1252(f )(1) includes one exception to this general prohibition: The lower courts retain the authority to "enjoin or restrain the operation of " the relevant statutory provisions "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."  In *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481–482, the Court stated that §1252(f )(1) "prohibits federal courts from granting classwide injunctive relief " but "does not extend to individual cases."  Here, both District Courts entered injunctions requiring the Government to provide bond hearings, not only for respondents, but also for all other class members.    Those orders "enjoin or restrain the operation" of §1231(a)(6) because they require officials to take actions that (in the Government's view) are not required by §1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by §1231(a)(6).  Those injunctions thus interfere with the Government's efforts to operate §1231(a)(6), and the injunctions do not fall within the exception for individualized relief because the injunctions were entered on behalf of entire classes of aliens.  Pp. 3–7.

(b) Respondents' two counter-arguments fail.  First, respondents

contend that "the operation" of the covered immigration provisions means the operation of those provisions "as *properly* interpreted" and that what §1252(f)(1) bars are class-wide injunctions that prohibit the Government from doing what the statute allows or commands. Brief for Respondents 49 (emphasis added). The ordinary meaning of the language of §1252(f)(1) weighs against respondents' interpretation. It is very common to refer to the "unlawful" or "improper" operation of something, and it is not apparent why the same cannot be said of a statute. The statutory context provides additional reasons to reject respondents' reading.

Respondents next argue that §1252(f)(1) allows class-wide relief so long as all the class members are "*individuals* who already face enforcement action." Brief for Respondents 55 (emphasis added). But §1252(f)(1) refers to "an individual," not "individuals," and the Court has repeatedly stated that it bars class-wide injunctive relief. See, *e.g., American-Arab Anti-Discrimination Comm.*, 525 U. S., at 481. Respondents argue that the absence of any express reference to class actions in §1252(f)(1)—unlike the express reference in §1252(e)(1)—suggests that no preclusion of class-wide relief was intended The Court is reluctant to give much weight to this negative inference; it is possible that §1252(f)(1) simply uses different language to bar class-wide injunctive relief. But a literal reading of the provision could also rule out efforts to obtain any injunctive relief that applies to multiple named plaintiffs. The Court has no occasion to adopt such an interpretation here. It is sufficient to hold that the class-wide injunctive relief awarded in these cases was unlawful. Pp. 7–10.

955 F. 3d 762 and 954 F. 3d 1245, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which KAGAN, J., joined, and in which BREYER, J., joined as to Parts II–A–2, II–B–2, and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–322

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* ESTEBAN ALEMAN GONZALEZ, ET AL.

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* EDWIN OMAR FLORES TEJADA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 13, 2022]

JUSTICE ALITO delivered the opinion of the Court.

Respondents in these two cases are aliens who were detained by the Federal Government pursuant to 8 U. S. C. §1231(a)(6) pending removal from this country. Respondents sued in two Federal District Courts, alleging that §1231(a)(6) requires the Government to provide bond hearings in cases like theirs. Both District Courts certified classes, agreed with respondents' claims on the merits, and entered class-wide injunctive relief. The Ninth Circuit affirmed both judgments in relevant part.

We granted certiorari and instructed the parties to address whether another provision of the Immigration and Nationality Act, 66 Stat. 208, as amended, 8 U. S. C. §1252(f)(1), deprived the District Courts of jurisdiction to entertain respondents' requests for class-wide injunctive relief. We hold that the statute has that effect, and we therefore reverse.

I

The two cases before us arise out of respondents' detention pursuant to §1231(a)(6), which gives the Federal Government discretionary authority in specified circumstances to detain aliens who have been "'ordered removed'" from the United States. See *Johnson* v. *Arteaga-Martinez*, 596 U. S. ___, ___–___ (2022) (slip op., at 4–5).

Respondents Esteban Aleman Gonzalez and Jose Eduardo Gutierrez Sanchez—the named plaintiffs in the case that bears Aleman Gonzalez's name—are natives and citizens of Mexico. They each reentered the United States illegally after being removed, and after they were apprehended, their prior orders of removal were "reinstated" as authorized by §1231(a)(5). They sought withholding of removal on the ground that they would be subject to torture or persecution if they were returned to Mexico. While they awaited proceedings before an immigration judge, they were detained under §1231(a)(6), and they then filed a putative class action in the United States District Court for the Northern District of California, alleging that aliens detained under §1231(a)(6) are entitled to bond hearings after six months' detention. The District Court certified a class of similarly situated plaintiffs and "enjoined [the Government] from detaining [respondents] and the class members pursuant to section 1231(a)(6) for more than 180 days without providing each a bond hearing." *Gonzalez* v. *Sessions*, 325 F. R. D. 616, 629 (2018). A divided panel of the Ninth Circuit affirmed. Compare *Aleman Gonzalez* v. *Barr*, 955 F. 3d 762, 766 (2020), with *id.,* at 790 (Fernandez, J., dissenting).

Respondent Edwin Flores Tejada—the named plaintiff in the case that bears his name—is a native and citizen of El Salvador. He likewise was previously ordered removed, reentered the country illegally, had his prior removal order reinstated, applied for withholding of removal, and was de-

tained under §1231(a)(6). He filed suit in the Western District of Washington, likewise alleging (as relevant here) that §1231(a)(6) entitled him to a bond hearing. The District Court certified a class, granted partial summary judgment against the Government, and entered class-wide injunctive relief. See App. to Pet. for Cert. 110a; Report and Recommendation in *Martinez Baños* v. *Asher*, No. 2:16–cv–01454 (WD Wash., Jan. 23, 2018) (ECF), Doc. 77–1, p. 2. A divided panel of the Ninth Circuit affirmed in relevant part. Compare *Flores Tejada* v. *Godfrey*, 954 F. 3d 1245, 1247 (2020), with *id.,* at 1251 (Fernandez, J., concurring in part and dissenting in part).

The Government petitioned for certiorari and asked us to decide whether an alien detained under §1231(a)(6) is entitled to a bond hearing. We granted that petition and instructed the parties to address the threshold question whether the District Courts had jurisdiction to entertain respondents' requests for class-wide injunctive relief. 594 U. S. \_\_\_ (2021).

## II

We hold that the District Courts exceeded their jurisdiction in awarding such relief.

### A

#### 1

We begin with the text of §1252(f)(1), which provides:

"Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority *to enjoin or restrain the operation of the provisions* of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part

have been initiated." (Emphasis added.)

With one exception that we will discuss momentarily, the critical language in this provision strips lower courts of "jurisdiction or authority" to "enjoin or restrain the operation of" the relevant statutory provisions. The ordinary meaning of these terms bars the class-wide relief awarded by the two District Courts.

The term "to enjoin" ordinarily means to "require," "command," or "positively direct" an action or to "require a person to perform, . . . or to abstain or desist from, some act." Black's Law Dictionary 529 (6th ed. 1990); see also Webster's Third New International Dictionary 754 (1993) (defining "enjoin" to mean "to direct, prescribe, or impose by order"). When a court "enjoins" conduct, it issues an "injunction," which is a judicial order that "tells someone what to do or not to do." *Nken* v. *Holder*, 556 U. S. 418, 428 (2009); see also Black's Law Dictionary, at 784 (defining an "injunction" as a "court order prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury"); 2 J. Story, Commentaries on Equity Jurisprudence §861, p. 178 (13th ed. 1886) (similar).

The term "to restrain" means to "check, hold back, or prevent (a person or thing) from some course of action." 5 Oxford English Dictionary 756 (2d ed. 1989) (emphasis deleted); Webster's Third New International Dictionary, at 1936 ("to hold (as a person) back from some action, procedure, or course: prevent from doing something"). We have suggested in another context that "restrain" sometimes has a "broad meaning" that refers to judicial orders that "inhibit" particular actions, and at other times it has a "narrower meaning" that includes "orders that stop (or perhaps compel)" such acts. *Direct Marketing Assn.* v. *Brohl*, 575 U. S. 1, 12–13 (2015) (emphasis deleted).

The object of the verbs "enjoin or restrain" is the "operation of" certain provisions of federal immigration law. See

§§1221–1232. The "operation of" (a thing) means the functioning of or working of (that thing). Random House Dictionary of the English Language 1357 (2d ed. 1987) ("an act or instance, process, or manner of functioning or operating"); Webster's Third New International Dictionary, at 1581 ("method or manner of functioning"). The way in which laws ordinarily "work" or "function" is through the actions of officials or other persons who implement them. This is certainly true of the statutes to which §1252(f)(1) refers—*i.e.*, the provisions of part IV of subchapter II of the Immigration and Nationality Act. Those provisions charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens. See §§1221–1232. Accordingly, the "operation of" the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them. As the Government put it at oral argument, the "operation of the provisions" is a reference "not just to the statute itself but to the way that [it is] being carried out." Tr. of Oral Arg. 11.

Putting these terms together, §1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions.

2

Section 1252(f)(1) includes one exception to this general prohibition: The lower courts retain the authority to "enjoin or restrain the operation of" the relevant statutory provisions "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."

The Court has already commented on the meaning of this exception. In *Reno* v. *American-Arab Anti-Discrimination*

*Comm.*, 525 U. S. 471, 481–482 (1999), we wrote that §1252(f)(1) "prohibits federal courts from granting class-wide injunctive relief" but "does not extend to individual cases." See also *Jennings* v. *Rodriguez*, 583 U. S. ___, ___ (2018) (slip op., at 29); *Nken*, 556 U. S., at 431.

This interpretation follows from the statutory text. In framing the exception to the general ban on injunctive relief, Congress used the phrase "an individual alien." It thus employed a singular noun ("an alien"), modified by an adjective ("individual") that means "pertaining or belonging to, or characteristic, of one single person." Black's Law Dictionary, at 783. Therefore, §1252(f)(1) does not preclude a court from entering injunctive relief on behalf of a particular alien (so long as "proceedings" against the alien have been "initiated"), but injunctive relief on behalf of an entire class of aliens is not allowed because it is not limited to remedying the unlawful "application" of the relevant statutes to "an individual alien."

3

On this interpretation of §1252(f)(1), the injunctions entered by the District Courts in these cases were barred. The respondents in both cases were detained pursuant to §1231(a)(6), and no one disputes that §1231(a)(6) is among the provisions the "operation" of which cannot be "enjoined or restrained" under §1252(f)(1). Both District Courts entered injunctions requiring the Government to provide bond hearings not only for respondents but also for all other class members.[1] Those orders "enjoin or restrain the operation"

---

[1] See *Gonzalez* v. *Sessions*, 325 F. R. D. 616, 629 (ND Cal. 2018) ("The Government is enjoined from detaining Plaintiffs and the class members pursuant to section 1231(a)(6) for more than 180 days without providing each a bond hearing before an [immigration judge]"); ECF Doc. 77–1, at 2 ("The Government is enjoined from enforcing their policy and practice of failing to provide class members with individualized custody hearings before an [immigration judge] every six months" (boldface and capitalization omitted)).

of §1231(a)(6) because they require officials to take actions
that (in the Government's view) are not required by
§1231(a)(6) and to refrain from actions that (again in the
Government's view) are allowed by §1231(a)(6). Those in-
junctions thus interfere with the Government's efforts to
operate §1231(a)(6), and the injunctions do not fall within
the exception for individualized relief because the injunc-
tions were entered on behalf of entire classes of aliens.[2]

B

Respondents advance two counter-arguments, but both
fail.

1

Respondents first contend that "the operation" of the cov-
ered immigration provisions means the operation of those
provisions "as *properly* interpreted" and that what
§1252(f)(1) bars are class-wide injunctions that prohibit the
Government from doing what the statute allows or com-
mands. Brief for Respondents 49 (emphasis added).

We do not think that this is the most natural interpreta-
tion of the term "operation," since it is very common to refer
to the "unlawful" or "improper" operation of whatever it is
that is being operated. See, *e.g.*, *Brendlin* v. *California*, 551
U. S. 249, 253 (2007) ("unlawful operation of the car"); *Kan-
sas* v. *Colorado*, 533 U. S. 1, 7 (2001) ("improper operation"
of "drainage ditches"); *Jeffers* v. *United States*, 432 U. S.
137, 149, n. 14 (1977) (plurality opinion) ("unlawful opera-
tion of motor carriers"); *Chicago, B. & Q. R. Co.* v. *Willard*,

---

[2] At oral argument, the Government suggested that §1252(f)(1) not
only bars class-wide injunctive relief but also prohibits any other form of
relief that is "practically similar to an injunction," including class-wide
declaratory relief. Tr. of Oral Arg. 16. The Government analogized
§1252(f)(1) to the Tax Injunction Act, 28 U. S. C. §1341, which we have
held extends to declaratory judgments. See *California* v. *Grace Brethren
Church*, 457 U. S. 393, 408–409 (1982). Because only injunctive relief
was entered here, we have no occasion to address this argument.

220 U. S. 413, 424 (1911) ("unlawful operation of a rail-way"); *United States* v. *Medford*, 661 F. 3d 746, 747 (CA4 2011) ("unlawful operation of video poker machines"); *In re Dillon*, 138 Fed. Appx. 609, 611 (CA5 2005) ("unlawful operation of public water utilities"); *Cadillac/Oldsmobile/Nissan Center, Inc.* v. *General Motors Corp.*, 391 F. 3d 304, 311 (CA1 2004) ("unlawful operation of [auto dealership]"); *Ickes* v. *FAA*, 299 F. 3d 260, 265–266 (CA3 2002) (*per curiam*) ("unlawful operation of [airplane]"); *Williams* v. *Panetta*, 70 F. 3d 110, 1995 WL 686128, *1 (CA1 1995) (*per curiam*) ("unlawful operation of a 'megawatt' CB radio"); *Cox Cable Tucson, Inc.* v. *Ladd*, 795 F. 2d 1479, 1485 (CA9 1986) ("unlawful operation of its CATV cable systems" (internal quotation marks omitted)). If cars, trucks, railroads, water utilities, drainage ditches, auto dealerships, planes, radios, video poker machines, cable TV systems, and many other things can be unlawfully or improperly operated, it is not apparent why the same cannot be said of a statute. Thus, the ordinary meaning of the language of §1252(f)(1) weighs against respondents' interpretation.[3]

Apart from ordinary meaning, the statutory context provides three additional reasons to reject respondents' reading. First, respondents' interpretation, which makes the reach of §1252(f)(1) depend on the nature of the claim in question, clashes with §1252(f)(1)'s prefatory clause, which

————————
[3] The dissent agrees that "operation" means "functioning" or "working," but it claims that "unlawful agency action is not a part of the functioning or working of the authorizing statute." *Post*, at 4 (opinion of SOTOMAYOR, J.). The reason that statutes cannot be operated unlawfully, according to the dissent, is this: "[A] statute is the law. Officials may implement a statute unlawfully, but a statute does not operate in conflict with itself." *Post*, at 11. But because to "implement" a statute is to "carry out" that statute, Random House Dictionary of the English Language 715 (2d ed. 1987); Webster's Third New International Dictionary 1134 (1993), the dissent's concession that a statute can be "implement[ed]" "unlawfully" is quite damaging to its position. The dissent asserts, but never explains why, the same cannot be said of a statute's "operation."

states that the bar applies "[r]egardless of the nature of the action or claim." See also *Nielsen* v. *Preap*, 586 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 4) (THOMAS, J., concurring in part and concurring in judgment).

Second, respondents' interpretation would limit §1252(f)(1)'s restriction to a most unlikely set of claims. With *perhaps* a few small exceptions,[4] the only claims to which §1252(f)(1)'s prohibition would apply are constitutional claims. But it would be most unusual for Congress to disfavor constitutional claims in this way. Cf. *Webster* v. *Doe*, 486 U. S. 592, 603 (1988) (requiring "clear" indication of congressional intent to "preclude judicial review of constitutional claims"). And if Congress had wanted to target just constitutional claims, it could have surely made the point more directly. The suggestion that Congress sought to achieve that goal by using the term "operation" is farfetched.

Third, respondents' interpretation would make a court's jurisdiction to entertain a request for class-wide injunctive relief dependent upon the merits of the claim. Under respondents' reading, if a complaint sought class-wide relief on the ground that the Government was misinterpreting and misapplying a covered statutory provision, the court would proceed to adjudicate the merits of that claim and might even hold a trial. But if the court ultimately rejected

_____

[4] Respondents argue in passing that their interpretation would also bar injunctive relief for certain statutory claims. See Brief for Respondents 52; see also *post*, at 12–13. Respondents hypothesize a situation in which a non-immigration statute, or some immigration statute not specified in §1252(f)(1), might require injunctive relief against the enforcement of one of the covered immigration provisions. Their brief cited no case in which such a situation has ever arisen. At oral argument counsel for respondents did reference one case, see Tr. of Oral Arg. 34–35 (referencing *Gonzales* v. *DHS*, 508 F. 3d 1227 (CA9 2007)), but that case stands at most for the unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not specified in §1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision, see *id.,* at 1233.

the claim on the merits, that holding would mean that the
court never had jurisdiction to grant that request for relief.[5]

For all these reasons, respondents' interpretation of "operation" must be rejected.

2

Respondents next argue that §1252(f)(1) allows class-
wide relief so long as all the class members are *"individuals*
who already face the enforcement action." Brief for Respondents 55 (emphasis added). But §1252(f)(1) refers to
"an individual," not "individuals," and as noted, we have
stated on more than one occasion that it bars class-wide injunctive relief. See *American-Arab Anti-Discrimination
Comm.*, 525 U. S., at 481; *Jennings*, 583 U. S., at ___ (slip
op., at 29); *Nken*, 556 U. S., at 431.

Respondents dispute the correctness of these statements
and point out that a nearby provision, §1252(e)(1)(B), expressly bars the certification of "a class under Rule 23 of
the Federal Rules of Civil Procedure." Because §1252(f)(1)
lacks any express reference to class actions, respondents infer that no preclusion of class-wide relief was intended.

We are reluctant to give much weight to this negative inference. It is possible that §1252(f)(1) simply uses different
language to bar class-wide injunctive relief and extends no
further. But if the provision is not read that way, then the
most plausible reading is not that it allows class-wide relief

———————

[5] The dissent says, *post*, at 13, that it is common for jurisdictional inquiries and the merits to overlap, and that is of course true. But the
dissent's interpretation would mean that §1252(f)(1) precludes injunctive relief for a plaintiff's statutory claim if, but only if, that claim already independently fails on the merits. The dissent cannot seriously
dispute that such *complete* overlap between a jurisdictional inquiry and
the merits of a claim is unusual, and an interpretation of §1252(f)(1) that
bars injunctive relief only when such relief would already be improper
fails to "give effect" to "every clause" of §1252(f)(1). *Duncan* v. *Walker*,
533 U. S. 167, 174 (2001) (internal quotation marks omitted).

but rather that it permits injunctive relief only "with respect to the application of [a covered provision] to *an individual alien* against whom proceedings under such part have been initiated." §1252(f)(1) (emphasis added). A literal reading of that language could rule out efforts to obtain any injunctive relief that applies to multiple named plaintiffs (or perhaps even rule out injunctive relief in a lawsuit brought by multiple named plaintiffs).

The Government does not advocate that we adopt such an interpretation, see Reply Brief 11, and we have no occasion to do so in these cases. It is sufficient to hold that the class-wide injunctive relief awarded in these cases was unlawful.[6]

\* \* \*

The judgments of the Court of Appeals are reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

―――――――
[6] The dissent also notes that *Califano* v. *Yamasaki*, 442 U. S. 682, 698–701 (1979), held that the Social Security Act provisions permitting "'[a]ny individual'" to file a "civil action" did not preclude class-wide relief. See *post*, at 7–8, 14. That judicial-review provision, the Court reasoned, was not "exempt" from the "operation of the Federal Rules of Civil Procedure" that authorized class actions. *Califano,* 442 U. S., at 700. Section 1252(f)(1) is quite different: It does not authorize judicial review but limits it, and the saving clause is an exception to the general bar on injunctive relief that must be read "narrowly in order to preserve the primary operation of the provision." *Maracich* v. *Spears*, 570 U. S. 48, 60 (2013) (internal quotation marks omitted). *Califano* is thus inapposite.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–322

———————

## MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* ESTEBAN ALEMAN GONZALEZ, ET AL.

## MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* EDWIN OMAR FLORES TEJADA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 13, 2022]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, and with whom JUSTICE BREYER joins as to Parts II–A–2, II–B–2, and III, concurring in the judgment in part and dissenting in part.

The Court holds that lower federal courts are powerless to issue classwide injunctive relief against the Executive Branch's violation of noncitizens' rights under several provisions of the Immigration and Nationality Act (INA). It reaches this conclusion in a purportedly textualist opinion that, in truth, elevates piecemeal dictionary definitions and policy concerns over plain meaning and context. I respectfully dissent from the Court's blinkered analysis, which will leave many vulnerable noncitizens unable to protect their rights.[1]

## I

Respondents in these two cases are named plaintiffs in

———————

[1] I concur in the judgment because the Government prevails on the merits. See Pet. for Cert. I; *Johnson* v. *Arteaga-Martinez*, 596 U. S. \_\_\_ (2022).

two class actions: Esteban Aleman Gonzalez and Jose Edu-ardo Gutierrez Sanchez in the *Aleman Gonzalez* litigation, and Edwin Omar Flores Tejada in the *Flores Tejada* litiga-tion. Respondents sought withholding of removal under the INA based on their fear that, if returned to their countries of origin, they would face persecution or torture. See *ante,* at 2; *Johnson* v. *Guzman Chavez*, 594 U. S. ___, ___–___ (2021) (slip op., at 5–7) (explaining "withholding-only pro-ceedings"). The Government detained them pending their proceedings, a detention this Court has held authorized by 8 U. S. C. §1231. See *Guzman Chavez*, 594 U. S., at ___ (slip op., at 1).

In both cases, respondents raised statutory and constitu-tional challenges to their prolonged detention without bond hearings. In both cases, respondents moved to certify clas-ses of similarly situated individuals. In *Aleman Gonzalez*, the District Court certified a class of "'all individuals who are detained pursuant to 8 U. S. C. §1231(a)(6) in the Ninth Circuit . . . and who have reached or will reach six months in detention, and have been or will be denied a prolonged detention bond hearing before an Immigration Judge.'" *Gonzalez* v. *Sessions*, 325 F. R. D. 616, 621, 626 (ND Cal. 2018). In *Flores Tejada*, the District Court certified a class of "'[a]ll individuals who (1) were placed in withholding only proceedings . . . in the Western District of Washington . . . , and (2) have been detained for 180 days (a) without a cus-tody hearing or (b) since receiving a custody hearing.'" App. to Pet. for Cert. 149a. By these definitions, the specified classes include only individuals against whom the Govern-ment has initiated removal proceedings.

Both District Courts held that §1231(a)(6) did not author-ize prolonged detention exceeding six months without bond hearings.[2] Both District Courts issued classwide injunctive relief (preliminary in *Aleman Gonzalez* and permanent in

——————

[2] The District Courts did not reach respondents' constitutional claims.

*Flores Tejada*) requiring individualized bond hearings. The Ninth Circuit affirmed in relevant part.

When the Government petitioned for certiorari, it challenged only the lower courts' interpretations of §1231(a)(6) as requiring bond hearings after six months of detention. See Pet. for Cert. I. The Court granted certiorari on the question presented by the Government in these cases and a companion case from the Third Circuit. 594 U. S. \_\_\_ (2021); see *Johnson* v. *Arteaga-Martinez*, 596 U. S. \_\_\_ (2022). The Court additionally directed the parties in these cases "to brief and argue the following question: Whether, under 8 U. S. C. §1252(f)(1), the courts below had jurisdiction to grant classwide injunctive relief." 594 U. S. \_\_\_. As to that question, the Court now holds that §1252(f)(1) barred the lower courts from granting such relief.

## II

Section 1252(f)(1) sets forth a precise limitation on the lower federal courts' jurisdiction to enter injunctive relief in cases involving specified sections of the INA. The provision states:

> "**(f) Limit on injunctive relief**
>   "**(1) In general**
>   "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§1221–1232], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."

Section 1252(f)(1) includes two operative clauses: a primary clause that strips courts of authority "to enjoin or restrain the operation of" the specified provisions of the INA,

and a saving clause that reserves that authority as applied to a noncitizen "against whom proceedings . . . have been initiated." Properly read, both clauses independently preserve the lower courts' authority to order classwide injunctive relief compelling the Executive Branch to comply with the INA in these cases. The Court holds otherwise only by disregarding the language Congress used in §1252(f)(1) itself, elsewhere in §1252, and in the INA as a whole.

A

1

Section 1252(f)(1)'s primary clause provides that the lower federal courts may not "enjoin or restrain the operation of" the specified provisions of the INA. An injunction that compels the Executive Branch to comply with the specified provisions (or, phrased differently, prohibits the unlawful implementation of the specified provisions) does not "enjoin or restrain" the "operation" of those provisions.

This is clear as a matter of plain meaning. Starting with the word "operation," all agree that the ordinary meaning of "operation" is "functioning" or "working." *Ante,* at 5. An injunction requiring the Executive Branch to conform its conduct with a statute or to cease statutorily unauthorized conduct does not enjoin or restrain the "functioning or working" of the statute. That is because unlawful agency action is not a part of the functioning or working of the authorizing statute.

The Government responds that "operation," as used in §1252(f)(1), is synonymous with "implementation," which may include either lawful or unlawful implementation. This contention, however, disregards Congress' careful choice of language. Section 1252(f)(1) says nothing about enjoining or restraining the Executive Branch's "implementation" of the law. By contrast, in other subsections of §1252 enacted simultaneously with this one, Congress

twice expressly limited jurisdiction over challenges to "implementation" of a statute or order or specified a particular forum for judicial review of such challenges. See §1252(a)(2)(A)(i) (restricting jurisdiction to review claims "arising from or relating to the implementation or operation of an order of removal"); §1252(e)(3)(A) (channeling review of the "implementation" of specified provisions into the U. S. District Court for the District of Columbia); see also §1252(a)(2)(A)(iv) (limiting jurisdiction to review "procedures and policies adopted by the Attorney General to implement" a certain provision). As this Court previously explained when interpreting this very statute: "'[W]here Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Nken* v. *Holder*, 556 U. S. 418, 430 (2009). "This is particularly true here, where [the relevant subsections of §1252] were enacted as part of a unified overhaul of judicial review procedures." *Id.,* at 430–431.

In addition to Congress' deliberate use of "operation," its use of "enjoin or restrain" in this context is most naturally read to bar only lower court injunctions that stop the operation of a statute, not those that command the Executive Branch to conform its conduct to the statute. It is true that, depending on the context, the word "enjoin" may describe a prohibition ("abstain or desist from . . . some act") or an affirmative command ("perform . . . some act"). Black's Law Dictionary 529 (6th ed. 1990); see *ante,* at 4. In §1252(f)(1), however, clear textual signals point to the conclusion that "enjoin" refers to a prohibition on the operation of a statute. First, Congress consistently has used the term "enjoin" in Title 8 to refer to prohibitions, including in the immediately neighboring and simultaneously enacted subsection,

§1252(f)(2).[3]  "A standard principle of statutory construc-
tion provides that identical words and phrases within the
same statute should normally be given the same meaning,"
*Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S.
224, 232 (2007), particularly where, as here, "the same term
was used in related provisions enacted at the same time,"
*Return Mail, Inc.* v. *Postal Service*, 587 U. S. ___, ___ (2019)
(slip op., at 12).  Even beyond §1252 itself, every use of "en-
join" in Title 8 refers to prohibitory injunctions.[4]  Moreover,
in §1252(f)(1) specifically, "enjoin" is paired with the term
"restrain," which means to "check, hold back, or prevent (a
person or thing) from some course of action."  8 Oxford Eng-
lish Dictionary 756 (2d ed. 1989) (emphasis deleted).  "[T]he
company [the word] keeps," *Direct Marketing Assn.* v.
*Brohl*, 575 U. S. 1, 13 (2015), thus cements a prohibitory
reading of "enjoin."  Under this reading, lower courts may
not prohibit the operation of the specified statutes, but
nothing in §1252(f)(1) prevents them from commanding
compliance with the statutes or enjoining unauthorized
agency action.

Finally, if any ambiguity remains as to the meaning of
the primary "enjoin or restrain the operation of" clause, a
longstanding clear-statement principle counsels in favor of

---

[3] Section 1252(f)(2) provides: "[N]o court shall enjoin the removal of
any alien pursuant to a final order under this section unless the alien
shows by clear and convincing evidence that the entry or execution of
such order is prohibited as a matter of law."  This use of "enjoin" can only
mean "prohibit."

[4] See §1227(a)(2)(E)(ii) (enacted simultaneously with §1252 and refer-
ring to a noncitizen "who at any time after admission is enjoined under
a protection order issued by a court," with "protection order" defined as
"any injunction issued for the purpose of preventing violent or threaten-
ing acts of domestic violence"); §1324a(f)(2) (authorizing the Attorney
General to sue over pattern or practice of unlawful employment, recruit-
ment, or referral of noncitizens under header titled "[e]njoining of pat-
tern or practice violations").  After oral argument in these cases, Con-
gress used the term "enjoined" in an amendment to an additional
provision of Title 8, again in a prohibitory sense.  See §1153(b)(5)(I)(iv)(I).

preserving the lower courts' remaining equitable jurisdiction. This Court "'will not construe a statute to displace courts' traditional equitable authority absent the clearest command.'" *McQuiggin* v. *Perkins*, 569 U. S. 383, 397 (2013) (quoting *Holland* v. *Florida*, 560 U. S. 631, 646 (2010)); accord, *e.g., Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946); *Brown* v. *Swann*, 10 Pet. 497, 503 (1836). There can be no doubt that §1252(f)(1) operates to displace equitable authority to an extent. As explained, however, the most natural and contextual reading of the provision's primary clause does not limit federal courts' authority to enjoin or restrain agency action unauthorized by statute, or to compel agency action commanded by a statute. The clause contains nothing approaching the clear command necessary, under centuries of this Court's precedents, to displace that authority.

2

Independently of §1252(f)(1)'s primary clause, the provision's saving clause also operates to preserve the lower federal courts' equitable authority here. That clause provides that lower courts may enjoin or restrain the operation of the covered statutory provisions "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." §1252(f)(1). Each beneficiary of the injunctions in these cases is "an individual alien against whom [removal] proceedings . . . have been initiated." *Ibid.* Under these circumstances, §1252(f)(1) poses no barrier to classwide injunctive relief.

The Government contends that the phrase "an individual alien" is inconsistent with injunctive relief on a classwide basis. A class action, however, is a collection of individual claims. See, *e.g., Califano* v. *Yamasaki*, 442 U. S. 682, 701 (1979) ("Where the district court has jurisdiction over the

claim of each individual member of the class, Rule 23 provides a procedure by which the court may exercise that jurisdiction over the various individual claims in a single proceeding"); *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393, 408 (2010) (plurality opinion of Scalia, J.) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits"). Moreover, contextual and historical evidence demonstrates that the enacting Congress would not have prohibited classwide relief simply by using the word "individual."

It was well understood when Congress enacted §1252(f)(1) in 1996 that mere use of the word "individual" would not preclude classwide adjudication or relief. In *Califano*, a unanimous Court interpreted §205(g) of the Social Security Act, codified at 42 U. S. C. §405(g), to permit class actions and classwide relief, even though the statute provided only that "'[a]ny individual'" could obtain judicial review. See 442 U. S., at 698–701. The Court rejected the Government's argument that the word "individual" required "a case-by-case adjudication of claims under §205(g) that is incompatible with class relief." *Id.,* at 698–699. "[C]lass relief is consistent with the need for case-by-case adjudication," the Court noted, "at least so long as the membership of the class is limited to those who meet the requirements of" the provision. *Id.,* at 701.

"We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co.* v. *Reynolds*, 559 U. S. 633, 648 (2010). When §1252(f)(1) was enacted in 1996, that precedent included both *Califano* and the settled rule, discussed above, that a statute should not be construed to displace a court's equitable authority absent a clear command. Yet Congress provided no such command against all classwide injunctive relief in §1252(f)(1).

Indeed, in other subsections of §1252, Congress provided precisely such a clear command. Section 1252(e)(1)(B), enacted simultaneously with §1252(f)(1), explicitly divests federal courts of authority to "certify a class under Rule 23 of the Federal Rules of Civil Procedure" in certain cases. The enacting Congress thus knew how to preclude classwide relief and did so in unmistakable terms when that was its intent. In §1252(f)(1), however, it made no mention of class actions or Rule 23. Again, "'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'" of language, particularly where, as here, it enacted the language as part of a unified whole. *Nken*, 556 U. S., at 430.

The Government responds that this reading of §1252(f)(1)'s saving clause renders the word "individual" superfluous. "'[S]ometimes the better overall reading of the statute contains some redundancy,'" however, as Congress may "emplo[y] a belt and suspenders approach" to ensure its aims are met. *Atlantic Richfield Co.* v. *Christian*, 590 U. S. \_\_\_, \_\_\_, n. 5 (2020) (slip op., at 10, n. 5). Relevant here, parties other than individuals in removal proceedings may bring immigration-related lawsuits. For example, prior to 1996, several organizations brought preenforcement challenges to immigration statutes. See Brief for Respondents 55 (collecting examples). In recent years, States, too, increasingly have sued on behalf of their own interests. See, *e.g., Biden* v. *Texas*, No. 21–954, now pending before the Court; *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. \_\_\_ (2020); *United States* v. *Texas*, 579 U. S. 547 (2016) (*per curiam*). In drafting §1252(f)(1), Congress had every reason "to be doubly sure," *Barton* v. *Barr*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 16), that only individuals in removal proceedings and not other entities would receive injunctive relief restraining the operation of the specified provisions of the INA. Additionally, the Government's redundancy concern is particularly unpersuasive

because Congress used the adjective "individual" redundantly in other immigration-related provisions within Title 8. See §1446(a) (authorizing the Attorney General to waive investigation of applicant for naturalization "in an individual case or in such cases or classes of cases as may be designated by him"); §1601(4) (expressing concern that "individual aliens," prior to 1996, were "burden[ing] the public benefits system").

3

In sum, the courts below retained their equitable authority to issue classwide injunctive relief for two independent reasons. First, the relief the District Courts issued did not purport "to enjoin or restrain the operation of" any statute; rather, the District Courts sought to enforce a statute and enjoin what they deemed to be unlawful agency action. Second, and in any event, the injunctive relief issued below fell within §1252(f)(1)'s saving clause because it concerned only the application of provisions of the INA to individual noncitizens in removal proceedings.

This interpretation is a reasonable one. Congress' express and particular use of words in §1252(f)(1) protected the specified statutory provisions against restraint by lower court injunctions, but evinced no quarrel with lower courts ensuring that the Executive Branch complied with the commands in those provisions. In addition, Congress ensured that this goal did not come at the expense of violating the rights of noncitizens in removal proceedings.

B

The Court reaches a contrary result only by prioritizing unavailing and largely atextual concerns.

1

Starting with the primary "enjoin or restrain the operation of" clause, the Court accepts the Government's argument that "the 'operation of' the relevant statutes is best

understood to refer to the Government's efforts to enforce or implement them." *Ante,* at 5. Aside from ignoring Congress' choice to restrict judicial review of "implementation" in some subsections of §1252 but not others, the Court misapprehends how statutes operate. No doubt, "laws ordinarily 'work' or 'function' . . . through the actions of officials or other persons who implement them." *Ante,* at 5. That proposition, however, only holds if those individuals properly implement the relevant statute. An unlawful implementation of a statute is not the "work[ing]" or "function[ing]" of the statute at all; it is simply unauthorized. Restraining such action does not interfere with the operation of the statute for purposes of §1252(f)(1).

Resisting this result, the Court offers a string cite of several inapt uses of "operation," none of which concern the operation of legal authority. See *ante,* at 7–8. The Court wonders why, "[i]f cars, trucks, railroads, water utilities, drainage ditches, auto dealerships, planes, radios, video poker machines, cable TV systems, and many other things can be unlawfully or improperly operated, . . . the same cannot be said of a statute." *Ante,* at 8. The answer is obvious: Unlike all of those examples, a statute is the law. Officials may implement a statute unlawfully, but a statute does not operate in conflict with itself.[5]

The Court also agrees with the Government that "enjoin," as used in §1252(f)(1), necessarily takes on both affirmative and negative connotations, but only by rigidly segmenting each word in the clause, defining each in isolation, and adding those definitions together. See *ante,* at 4. Elsewhere, however, this Court has cautioned against such a piecemeal approach to statutory interpretation. Cf., *e.g., FCC* v.

——————

[5] The Court's sole response is to suggest that if an official can "'carry out'" a statute contrary to its terms, the statute should be able to "'operat[e]'" contrary to itself, too. *Ante,* at 8, n. 3. This once again elides the distinction Congress drew in §1252 between "implementation" and "operation," a difference that must be given meaning. See *supra,* at 4–5.

*AT&T Inc.*, 562 U. S. 397, 406 (2011) (cautioning that "two words together may assume a more particular meaning than those words in isolation"). Moreover, the Court pays no mind to Congress' other uses of "enjoin" in §1252 and elsewhere in Title 8 as meaning banning or stopping.

The Court offers one final purportedly textual basis for its strained reading of the primary clause: that it is the only option consistent with §1252(f)(1)'s prefatory clause. See *ante,* at 8–9; §1252(f)(1) ("Regardless of the nature of the action or claim . . . "). The prefatory clause, however, does not purport to expand the scope of §1252(f)(1)'s restriction; it simply makes clear that the restriction must apply to all claims that would otherwise fall within it, without exception. See *Atlantic Richfield Co.*, 590 U. S., at ___, n. 5 (slip op., at 10, n. 5) (reasoning similarly as to phrase "'without regard to the citizenship of the parties or the amount in controversy'").

The Court closes with two policy arguments. It deems it "most unlikely" that Congress would enact a statute that disproportionately limits lower courts' authority to issue injunctive relief to remedy constitutional claims, a result it contends would flow from respondents' reading. *Ante,* at 9. This is in large part a problem of the Court's own making. As explained, a proper interpretation of §1252(f)(1)'s saving clause preserves lower courts' authority to issue injunctive relief on constitutional claims, including on a classwide basis, so long as all plaintiffs are individuals against whom removal proceedings have been initiated. Moreover, even in preenforcement challenges brought by entities or by individuals not in removal proceedings, respondents' reading of §1252(f)(1) does not prohibit injunctive relief exclusively as to constitutional claims, but also as to claims that arise from any statutes external to the covered INA provisions (for example, a claim that a covered provision violates the Religious Freedom Restoration Act (RFRA)). See *ante,* at 9,

n. 4. The correct reading of §1252(f)(1) evenhandedly protects the specified INA provisions from all such external, preenforcement, lower court injunctions, whether on statutory or constitutional grounds, without shielding unlawful agency action inconsistent with the specified provisions. Whatever the Court may think of the wisdom of that policy, it is a perfectly plausible one.

The Court also worries that under this reading of §1252(f)(1), the inquiry as to whether injunctive relief is available may overlap with the merits of a claim that a covered provision has been violated. *Ante,* at 9–10. The Court is wrong to find "anything unusual about that consequence." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338, 351 (2011). Even as to the question of subject-matter jurisdiction (as opposed to the remedial authority at issue here), "[t]he necessity of touching aspects of the merits . . . is a familiar feature of litigation." *Id.,* at 351–352; accord, *e.g., Perry* v. *Merit Systems Protection Bd.*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 14) ("[T]he distinction between jurisdictional and merits issues is not inevitably sharp, for the two inquiries may overlap"). Any overlap may be substantial: Under the Federal Tort Claims Act, for instance, "all elements of a meritorious claim are also jurisdictional." *Brownback* v. *King*, 592 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 8).[6] This concern, too, offers no justification for the Court's departure from ordinary meaning or its disregard of clear contextual evidence contrary to its view.

_____

[6] The Court states that respondents' reading of §1252(f)(1) will, in some cases, cause a "*complete* overlap between a jurisdictional inquiry and the merits of a claim." *Ante,* at 10, n. 5. Once again, such an overlap is far from unprecedented. Moreover, as the Court implicitly concedes, it will not always be present. As explained, respondents' interpretation divests the lower courts of authority to issue injunctive relief on external challenges to the specified provisions (*e.g.,* a challenge to a specified provision based on RFRA or the Due Process Clause), regardless of the merits of those challenges, unless the saving clause applies.

2

The Court's arguments in support of its reading of the saving clause fare little better. The Court opens with language from past cases suggesting support for its interpretation. See *ante,* at 5–6. None of the cases the Court quotes, however, presented or decided the scope of §1252(f)(1)'s bar on injunctive relief.

The Court next affords dispositive weight to its class-exclusive view of the word "individual" in §1252(f)(1). See *ante,* at 6. The Court distinguishes *Califano* in a footnote, asserting that §1252(f)(1)'s saving clause should be construed narrowly because it is an exception to the primary clause. See *ante,* at 11, n. 6. The point, however, is not that the statute interpreted in *Califano* was identical to §1252(f)(1), but that *Califano* established that a statute's mere use of the word "individual" does not suffice to preclude classwide relief. Moreover, the Court overlooks that it is §1252(f)(1)'s primary clause (which divests lower courts of their "'traditional equitable authority'") that constitutes an exception to the norm. *McQuiggin*, 569 U. S., at 397. The Court ignores the clear-statement rule for such displacements of courts' equitable jurisdiction. *Califano* and the clear-statement rule both instruct that Congress would not have done so much so obliquely, particularly when it clearly prohibited class relief in another subsection of the same statute.

On the question of Congress' disparate inclusion and exclusion of language in §1252 referring to class actions, the Court declines to decide what it thinks. Taking one path, it suggests that one should not "give much weight to this negative inference." *Ante,* at 10. But see *Nken*, 556 U. S., at 430–431 (giving weight to equivalent inference when interpreting same statute). Taking another, the Court admits that adhering to its holding might well "rule out efforts to obtain any injunctive relief that applies to multiple named plaintiffs (or perhaps even rule out injunctive relief in a

lawsuit brought by multiple named plaintiffs).” *Ante,* at 11.
That result, which would require separate remedial orders
or even separate lawsuits for family members asserting le-
gally and factually identical claims based on joint immigra-
tion applications or proceedings, is absurd. There is no con-
ceivable benefit in requiring identical claims to be raised in
separate, duplicative actions. This bizarre outcome offers
further proof that the Court has erred.

## III

The ramifications of the Court’s errors should not be ig-
nored. Today’s holding risks depriving many vulnerable
noncitizens of any meaningful opportunity to protect their
rights.

To understand why, consider the practical realities of the
removal and detention system. Noncitizens subjected to re-
moval proceedings are disproportionately unlikely to be fa-
miliar with the U. S. legal system or fluent in the English
language. Even so, these individuals must navigate the Na-
tion’s labyrinthine immigration laws without entitlement
to appointed counsel or legal support. If they are detained,
like respondents here, they face particularly daunting hur-
dles. On average, immigration detention facilities are lo-
cated significantly farther away from detained individuals’
communities and court proceedings than criminal jails,
making it extraordinarily difficult to secure legal represen-
tation. Even for those individuals who can locate and afford
counsel under these circumstances, such remote confine-
ment impedes evidence gathering and communication with
counsel. After traveling (perhaps for hours) to meet with
detained clients, attorneys may be barred from doing so due
to logistical or administrative errors; legal phone calls, too,
frequently are nonconfidential, prohibitively costly, or oth-
erwise unavailable. Exacerbating these challenges, the

Government regularly transfers detained noncitizens be-
tween facilities, often multiple times.[7]

It is one matter to expect noncitizens facing these obsta-
cles to defend against their removal in immigration court.
It is another entirely to place upon each of them the added
burden of contesting systemic violations of their rights
through discrete, collateral, federal-court proceedings. In a
great many cases, the inevitable consequence of barring
classwide injunctive relief will be that those violations will
go unremedied, except as to the few fortunate enough to af-
ford competent collateral counsel or to secure vigorous
*pro bono* representation. The burdens will fall on those
least able to vindicate their rights, as well as the law firms
and nonprofit organizations that will endeavor to assist as
many of these noncitizens as their capacity permits.[8]

If, somehow, a substantial number of noncitizens are able
to overcome these obstacles and file separate federal law-
suits against unlawful removal or detention policies, a dif-
ferent problem will arise. Class litigation not only enables

——————

[7] See, *e.g.,* Brief for Former Immigration Judges et al. as *Amici Curiae*
8–14; Z. Manfredi & J. Meyers, Isolated and Unreachable: Contesting
Unconstitutional Restrictions on Communication in Immigration Deten-
tion, 95 N. Y. U. L. Rev. 130, 139–145 (2020); E. Ryo & I. Peacock, A Na-
tional Study of Immigration Detention in the United States, 92 S. Cal.
L. Rev. 1, 29, 37–41 (2018); I. Eagly & S. Shafer, A National Study of
Access to Counsel in Immigration Court, 164 U. Pa. L. Rev. 1, 30–36
(2015); P. Markovitz et al., Accessing Justice: The Availability and Ade-
quacy of Counsel in Removal Proceedings, 33 Cardozo L. Rev. 357, 367–
373 (2011); M. Taylor, Promoting Legal Representation for Detained Al-
iens: Litigation and Administrative Reform, 29 Conn. L. Rev. 1647,
1670–1673 (1997); cf. *Demore* v. *Kim*, 538 U. S. 510, 554 (2003) (Souter,
J., concurring in part and dissenting in part) (explaining that immigra-
tion officials "can detain, transfer, and isolate aliens away from their
lawyers, witnesses, and evidence").

[8] It is no answer to say that other individuals similarly situated may
generate controlling precedent by pursuing their own claims. In the
months or years it may take to secure a published appellate ruling re-
solving a pertinent legal issue, a great many noncitizens without mean-
ingful access to justice will suffer irreparable injury.

individual class members to enforce their rights against powerful actors, but also advances judicial economy by eliminating the need for duplicative proceedings pertaining to each class member. In contrast, the Court's overbroad reading of §1252(f)(1) forces noncitizens facing unlawful detention, if they are able, "to flood district court dockets with individual habeas actions raising materially indistinguishable claims and requesting materially indistinguishable injunctive relief." Brief for Retired Federal Judges as *Amici Curiae* 15. There is no reason to think Congress intended either of these untenable results.

In fairness, the Court's decision is not without limits. For instance, the Court does not purport to hold that §1252(f)(1) affects courts' ability to "hold unlawful and set aside agency action, findings, and conclusions" under the Administrative Procedure Act. 5 U. S. C. §706(2). No such claim is raised here. In addition, the Court rightly does not embrace the Government's eleventh-hour suggestion at oral argument to hold that §1252(f)(1) bars even classwide declaratory relief,[9] a suggestion that would (if accepted) leave

--------

[9] Although I reach no definitive conclusion on this unpresented issue, it is difficult to square the Government's claim with the statute Congress enacted. Section 1252(f)(1) limits lower courts' authority to "enjoin or restrain," whereas a declaratory judgment (unlike an injunction) "'is not ultimately coercive.'" *Steffel* v. *Thompson*, 415 U. S. 452, 471 (1974). In addition, §1252(f)(1) is titled "[l]imit on injunctive relief," in contrast to nearby §1252(e)(1)'s broader "[l]imitations on relief." True to its title, §1252(e)(1) expressly prohibits courts from "enter[ing] declaratory, injunctive, or other equitable relief" under certain circumstances, whereas §1252(f)(1) makes no mention of declaratory relief.

Moreover, if (as the Court holds today) §1252(f)(1) bars classwide relief, and (as the Government suggests) the provision affects both injunctive and declaratory relief, it is hard to see how any class action could proceed, as no relief would be available in the lower courts. That, in turn, would prevent any such case from reaching this Court, rendering Congress' reservation of this Court's authority a nullity. See §1252(f)(1) (stripping authority from all courts "other than the Supreme Court").

many noncitizens with no practical remedy whatsoever
against clear violations by the Executive Branch.

Even with these limits, however, the repercussions of to-
day's decision will be grave. In view of the text and context
of §1252(f )(1), these repercussions offer yet more evidence
that the Court's interpretive effort has gone badly astray.

*     *     *

The essence of statutory interpretation is to review the
plain meaning of a provision in its context. The Court's
analysis, by violating several interpretive principles, ulti-
mately fails in that endeavor. I respectfully dissent.

---

For these reasons and others, several Courts of Appeals have held that
§1252(f )(1) poses no bar to the issuance of declaratory relief. See *Brito*
v. *Garland*, 22 F. 4th 240, 250–252 (CA1 2021); *Make The Road New
York* v. *Wolf*, 962 F. 3d 612, 635 (CADC 2020); *Alli* v. *Decker*, 650 F. 3d
1007, 1010–1013 (CA3 2011); *Rodriguez* v. *Hayes*, 591 F. 3d 1105, 1119–
1120 (CA9 2010). But see *Hamama* v. *Adducci*, 912 F. 3d 869, 880, n. 8
(CA6 2018) (suggesting, but not holding, otherwise).